**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch**

Civil Action No. 13-cv-02408-RPM

CYNTHIA MONTOYA,

   Plaintiff,

vs.

HUNTER DOUGLAS WINDOW FASHIONS, INC.,

   Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

In this civil action, Plaintiff Cynthia Montoya asserts three claims for relief against her former employer, Defendant Hunter Douglas Window Fashions, Inc. ("Hunter Douglas"): gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-301 *et seq.*; and retaliation under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*  Hunter Douglas has moved for summary judgment of dismissal.  The following facts are material and are not in genuine dispute.

Hunter Douglas hired Montoya as a temporary employee in November 1997.  At some time, she was promoted to "team lead."

In September 2008, Jeff Geist, Montoya's boss, promoted her to fabrication supervisor for Hunter Douglas' second shift, which worked from 2:20 p.m. to 10:20 p.m.  In offering her the promotion, Geist stated:  "[Montoya] has met and exceeded my expectations of

meeting all the technical aspects of the position. I have also been impressed with her ability to lead and bring the . . . team working as one unit. Cindy continues to grow in all areas of leadership, communication, coaching, and team skills." [Doc. 21, Plaintiff's Statement of Undisputed Material Facts ("PSUMF") ¶¶ 1-3.]

Montoya supervised 55 employees in her role as fabrication supervisor. Geist testified that Montoya's shift performed "very well" in the areas of "[p]roductivity and yields and on-time delivery." [Id. ¶ 8.] Montoya often went to work early, skipped her lunch breaks, and worked late. [Id. ¶ 9.][1] At some time, Montoya was asked to cover for an employee who was out of work for five weeks. Montoya assumed those responsibilities, even though it added to her workload. [Id. ¶ 12.]

Montoya went on FMLA leave from October 29, 2009 until November 16, 2009. According to a corrective action document in Montoya's file, several Hunter Douglas employees informed Geist while Montoya was out that she had been spending work time on personal Internet activity, which was disruptive; for example, when one employee asked Montoya for assistance, she made the employee wait until she finished purchasing tickets online. [Doc. 14, Ex. C at 16.] Geist then initiated an investigation that looked at Montoya's Internet use from September 9, 2009 through October 27, 2009. The investigation showed that Montoya spent 24.5 hours during that six-week period browsing the Internet for personal purposes. [Id. at 18.] Hunter Douglas' Internet Access policy, which Montoya received and signed, only allows employees to use the Internet for business purposes; "personal use is strictly prohibited." [Id. at 22.]

---

[1] Hunter Douglas denies this statement [Doc. 24 at 5 ¶ 9] but does not provide evidence in support of its position.

In November 2009, having completed his investigation, Geist gave Montoya a Final Warning and Performance Improvement Plan ("PIP") and placed her on a 90-day probationary period. Montoya's PIP stated that employees had complained that Montoya spoke excessively with favored employees, failed to follow-up with employees needing assistance, took long lunch hours, spent insufficient time on the production floor, left early from her shift, and excessively used the Internet for personal shopping. The PIP stated that Montoya needed to be visible and available to her team and engaged in her work, that improvements in her performance needed to be "immediate and sustained," and that "failure to sustain performance expectations could result in further corrective action up to and including termination." [Doc. 14, Defendant's Statement of Undisputed Material Facts ("DSUMF") ¶¶ 13-15.]

In the months following the PIP, Montoya made a concerted effort to spend less time on the Internet at work and to improve communication with her subordinates. A March 19, 2010 report following up on Montoya's PIP noted that Montoya had improved her overall performance and that she had spent only three hours on the Internet over a 12-week period. The report reiterated that Montoya needed to maintain her performance improvements and that failure to do so could result in her employment being terminated. [DSUMF ¶¶ 16-17.]

In October 2010, Montoya received a performance review in which Geist commended her for having Hunter Douglas' main products "above goal" and for not having any major quality issues during the year. Geist wrote: "This could only be accomplished by the training and the awareness your team has towards quality." He further stated that "all the spring/fall launches for 2010 have been implemented by fabrication on time without any surprises or issues. . . . Great job managing and communicating the changes." [Doc. 21, Ex.

3

6.] Geist noted that: "Overall you have done a good job in maintaining and improving all areas outlined in the Performance Improvement Plan." [Doc. 21, Ex. 6 at 8.] Geist gave Montoya an overall rating of "Competent." [Doc. 14, Ex. C at 50.]

In July 2011, Geist disciplined Montoya for taking a negative approach towards her daily activities. [Id. at 60.] Geist noted that Montoya was "[a]lways saying she does not have enough people"; her "[b]ody language and tone" indicated dissatisfaction with Geist's leadership; she was "[g]oing through the motions, and not showing much engagement"; and she was "[u]n-happy [sic] about overtime situations that she [had] to cover." [Id.] Geist told Montoya that she was showing the same type of behavior that had led to the PIP in November 2009 and that she needed to change. [Id.]

In October 2011, Montoya received a performance evaluation in which Geist praised her for meeting or exceeding certain goals. [Id. at 56.] Again, Geist gave Montoya an overall rating of "Competent." [Id. at 58.]

On Friday, August 3, 2012, Montoya informed Hunter Douglas that she would be late for work because she needed to take care of her mother. Later that day, Montoya left a message stating that she would not make it to her shift because of her family situation. That weekend, Montoya was under a psychologist's care for "stress and relationship complications" because she and her fiancé had broken up. On Monday, August 6, Montoya informed Hunter Douglas that she would be out of the office until August 8. On August 8, Montoya left a voicemail for Hunter Douglas Human Resources stating that her doctor was taking her off work for the rest of the week and that she wanted to convert the vacation days she was using into FMLA leave. Montoya's doctor released her to return to work on Monday, August 13,

but Montoya took that week off as part of a previously-scheduled vacation. [DSUMF ¶¶ 20-22.]

CIGNA Insurance administers Hunter Douglas' FMLA policy. Once an employee requests FMLA leave, Human Resources notifies CIGNA, and CIGNA then mails a form to the employee's home that the employee is required to complete and return. CIGNA sent several letters to Montoya concerning her FMLA request but she failed to respond. Montoya denies receiving those letters but does not dispute the fact that they were sent to her mailing address. CIGNA denied Montoya's FMLA request. Hunter Douglas paid Montoya for the days in August when she was not working. [DSUMF ¶¶ 23-24.]

Jeff Geist states in his affidavit that when Montoya was out of the office, he spoke to several of Montoya's co-workers and subordinates and learned that her performance had slipped again. According to Geist, the employees, including Montoya's team coordinators, said that Montoya was ignoring requests for assistance while spending time on non-work-related websites; frequently leaving early and absent from the workplace for hours at a time; rarely on the production floor; constantly on her cell phone; and using the Internet to plan for her wedding. Geist also learned that Montoya had failed to write and/or deliver performance reviews and performance improvement plans for some of her subordinates. Geist reviewed Montoya's Internet use and learned that, between June 1 and July 31, 2012, she visited 20,761 websites, including the retail website macys.com 1,042 times, facebook.com 500 times, and the retail website menswearhouse.com 246 times. [DSUMF ¶¶ 27-29.]

When Montoya returned to work, Geist and Trish Devlin, a Hunter Douglas human resources officer, told Montoya that they were investigating her work performance and wanted her side of the story. Montoya acknowledged that she was several months behind in

delivering performance reviews to certain subordinates. Devlin asked Montoya whether she shared Hunter Douglas' concern that she was able to find the time to be on the Internet, yet reviews were not being completed. Montoya said she did not share that concern. Geist and Devlin informed Montoya that she would be suspended while they determined next steps. [DSUMF ¶ 26, 30-31.] Several days later, her employment was terminated based on Geist and Devlin's recommendation.

Montoya's claims of gender discrimination under Title VII and the Colorado Anti-Discrimination Act are both analyzed under the McDonnell-Douglas burden-shifting scheme. Even if Montoya could establish a *prima facie* case of gender discrimination, Hunter Douglas has articulated legitimate, nondiscriminatory reasons for firing her – she was not performing adequately and she had violated clear directives concerning Internet use. Montoya must therefore show that Hunter Douglas' reasons are a pretext for discrimination.

Montoya argues that her past performance, for which she was commended through positive performance evaluations, demonstrates a weakness in Hunter Douglas' justification. Montoya's generally positive performance evaluations from 2010 and 2011 do not negate any subsequent discipline or claims of poor performance. There is no genuine dispute that Montoya's co-workers and subordinates complained to Geist about her performance in August 2012, that Geist found out Montoya had been delinquent in providing performance reviews for some employees, and that Montoya had excessively used the Internet for personal reasons in June and July of 2012.

Montoya flatly states that Jeff Geist looked down on women and treated men better than women; she does not provide any evidence supporting that statement. Montoya also states that Geist discouraged her from going to lunch with another Hunter Douglas employee, a

woman; the record shows that Geist did so out of concerns regarding favoritism, not because of gender.

Montoya makes much of the fact that, notwithstanding Hunter Douglas' Internet Access policy, in practice employees were permitted to and did use the Internet for personal reasons while at work without punishment. Hunter Douglas has acknowledged that personal Internet use was generally acceptable if it was only from time to time and did not interfere with an employee's work. In Montoya's case, it was shown in November 2009 that she was using the Internet excessively and that she was not fulfilling her duties as a supervisor. That led to the Final Warning and her PIP. In August 2012, Montoya was again shown to have been using the Internet excessively and not fulfilling her duties as a supervisor. It is this combination – excessive Internet use and sub-par performance – that separates Montoya from the employees to whom she refers.

It was insensitive for Hunter Douglas to fire Montoya while she was undergoing great personal stress from the break-up of her marriage and the death of her mother following an illness. In the Court's view, Montoya was treated shabbily. That does not mean that the reasons given for firing Montoya were a pretext masking a discriminatory motivation. The record does not support a reasonable finding of pretext.

It was made clear at the October 30, 2014 hearing that Montoya never actually took FMLA leave in the summer of 2012 because she failed to return the required paperwork to CIGNA. Thus, her FLMA retaliation clam cannot be based on the use of FMLA leave. Instead, Montoya asserts that Hunter Douglas retaliated against her for simply requesting FMLA leave. Beyond the temporal proximity between Montoya's FMLA leave request and her termination, there is nothing in the record suggesting that Hunter Douglas retaliated

against her for making that request. The record supports only one reasonable conclusion: Montoya was fired because Geist believed her job performance was inadequate and that she abused personal use of the Internet.

Upon the foregoing, it is

ORDERED that Defendant Hunter Douglas Window Fashion's Motion for Summary Judgment [Doc. 13] is granted. The clerk shall enter judgment dismissing this civil action and awarding Hunter Douglas costs.

Dated: October 31, 2014

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch
Senior District Judge